## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JOHN ALEXANDER WAGNER, #371-133   *

                                              *

Plaintiff,                         *

                                              *

v                              *       Civil Action No.  ELH-16-98

                                              *

BRIAN G. IAMES,                 *

DEAN W. ROUNDS, SR.         *

CODY W. GILPIN,                 *

WARREN G. MALLOW,         *

FRANK B. BISHOP, JR.         *

BRADLEY A. WILT,              *

NP JANETTE CLARK            *

                                              *

Defendants.                     *

                                            ***

### MEMORANDUM OPINION

      John Alexander Wagner, the self-represented plaintiff, is an inmate at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland.  He has filed a § 1983 civil rights action (ECF 1), in which he has sued the seven defendants named in the caption.  *Id.*[1]  Wagner's Complaint, with numerous attachments, totals almost 100 pages.  ECF 1; ECF 1-1; ECF 1-2; ECF 1-3; ECF 1-4.

      Wagner alleges multiple claims:  use of excessive force; failure to protect from harm; denial of adequate medical care; denial of due process; and retaliation.  The claims are rooted in

---

[1] I note that in ECF 1-1, also labeled as a Complaint, Wagner named additional individuals not included on the form Complaint (ECF 1).  They are Nicolas J. Soltas; Corey A. Dolley; CO Anderson; Gregg A. Hershberger; and Collin Ottey, M.D.  Wagner also named hearing officer "John Doe."  ECF 1-1 at 2, ¶ 10.  Wagner later indicated that he believes the hearing officer is David Sipes.  ECF 1-1 at 9, ¶93; ECF 1-1 at 10, ¶ 3.

      None of these individuals was ever served.  Moreover, no response has been filed for them.  Therefore, I have not considered them as defendants.  After counsel is appointed in this case, he or she may move to amend the complaint to name these persons as defendants, if deemed warranted, and counsel must arrange to effect service of process upon them.

an incident at NBCI on September 24, 2014.  ECF 1.  In addition to substantial compensatory and punitive damages, Wagner seeks preliminary and permanent injunctive relief; transfer to another correctional institution; a medical evaluation by a provider outside the prison; and an order to record his movements whenever he is outside his cell; and compensatory and punitive damages.  ECF 1 at 3; ECF 1-1 at 10-11.[2]

The Complaint is lengthy and repetitive.[3]  It includes a 3-page court approved §1983 complaint form that is supplemented by an additional 54-pages labeled as a "Complaint"; a copy of a Request for Administrative Remedy ("ARP"), NBCI #2745-14; two notices of infractions dated September 24, 2014; a motion for appointment of counsel with a supporting declaration; a motion to proceed in forma pauperis; a proposed order to show cause with a temporary restraining order and supporting declaration; declarations of other inmates; and a copy of a 30-page complaint that Wagner filed in the Circuit Court for Baltimore City, Case No. 24-C-14-006421.  ECF 1; ECF 1-1; ECF 1-2; ECF 1-3; ECF 1-4.[4]

Defendant Janette Clark, N.P. has filed a motion to dismiss, or, in the alternative, for summary judgment (ECF 26), supported by a memorandum (ECF 26-1) and exhibits (collectively, "Clark's Motion").  Defendants Warden Frank B. Bishop, Jr.; Lt. Bradley A. Wilt; Sgt. Brian G. Iames; C.O. II Dean W. Rounds, Sr.; C.O. II Cody W. Gilpin; and C.O. II Warren G. Mallow ("State Defendants") also filed a motion to dismiss or, in the alternative, for summary judgment (ECF 33), supported by a legal memorandum (ECF 33-2) and numerous exhibits.  *See*

---

[2]  Page citations are to the pagination in the electronic record.

[3]  The Complaint reflects that it was signed by Wagner on October 6, 2014.  Curiously, it was not docketed until January 7, 2016.

[4]  The Baltimore City Circuit Court case, Case No. 24-C-14-006421, appears to have been closed due to Wagner's failure to provide necessary documentation.  ECF 1-3 at 1-7; ECF 1-4.  Wagner does not explain why he provided a copy of a complaint in a closed state case.

ECF 33-4 to ECF 33-22; ECF 43-1 (collectively, the "State's Motion").   They deny the allegations and assert, *inter alia*, defenses of respondeat superior and qualified immunity. Plaintiff filed a consolidated opposition (ECF 38) along with a memorandum, a statement of disputed material facts, declarations, a request for discovery, and 141 pages of exhibits.  *See* ECF 38-1 to ECF 38-6.  Nurse Clark replied.  ECF 42.

Also pending are Wagner's motion (ECF 35) for an extension of time to reply to Clark's Motion; a motion for a temporary restraining order and a preliminary injunction (ECF 8); two motions to preserve evidence (ECF 16 and ECF 36); and a motion to appoint counsel.  ECF 39.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6 (D. Md. 2016).

I will construe Clark's Motion as a motion for summary judgment (ECF 26) and enter judgment in Clark's favor.  As to State Defendant Wilt, I will construe the State's Motion (ECF 33) as a motion to dismiss and grant it.  As to the due process claim against the remaining State Defendants, I will construe the State's Motion as a motion to dismiss and will grant it, without prejudice to plaintiff's right to amend his Complaint.   As to the remaining claims and the remaining State Defendants, I shall construe the State's Motion as one for summary judgment. As to Warden Bishop, I shall grant the State's Motion.  As to State Defendants Gilpin, Rounds, Mallow, and Iames, there are genuine issues of material fact as to the remaining claims. Therefore, I shall deny the motion for summary judgment as to the remaining State Defendants, as outlined below.

I will also grant Wagner's motion for appointment of counsel (ECF 39) and his motion for an extension of time, nunc pro tunc (ECF 35).  But, I will deny plaintiff's motions to preserve evidence (ECF 16 and 36) and his motion for a restraining order and a preliminary injunction (ECF 8).

I.      **Wagner's Contentions**

        **A.  The Incident of September 24, 2014**

Wagner claims that on September 24, 2014, beginning at about 12:15 p.m., Officers

Iames, Rounds, Gilpin, and Mallow became "threatening and aggressive" toward him in

retaliation for Wagner's meeting with an investigator for the Internal Investigation Unit ("IIU").

ECF 1-1 at 2, ¶¶ 12, 13, 14; *see* ECF 33-8 at 1; ECF 33-11 at 10-11, 42-43; ECF 43-1 at 1; ECF

33-6 at 2, 5.[5]  According to Wagner, at the relevant time he was in full restraints and posed no

threat to the officers, other prisoners, or himself.  ECF 1-1 at 2-3, ¶ 17.  And, he complains that

the incident of September 24, 2014, was the "sixth inordinate use of force" against him.  ECF 1

at 3.[6]

Wagner recounts that Iames "maliciously" removed Wagner's legal mail, writing

materials, and asthma medication from the contingency cell.  ECF 1-1 at 2, ¶ 15.  While Wagner

was "speaking against the misfeasance of defendants' actions," Gilpin and Rounds started to

"aggressively pull" on his arms and Mallow grabbed his cuffs from behind.  *Id.* at 3, ¶ 18.  Iames

told Wagner that he should not have contacted the IIU, and instructed Gilpin and Rounds to

place Wagner in the cell.  When Wagner complained he was being punished for litigating and

needed his legal materials, he was told that he was making trouble by complaining and filing

---

[5]   The IIU is the abbreviation for Internal Investigative Unit, which is currently known as
the Intelligence and Investigative Division ("IID") for the Maryland Department of Public Safety
and Correctional Services.  ECF 33-2 at 2 n. 4.  In this Memorandum Opinion, IIU and IID are
used interchangeably to refer to the same investigative office.

[6] Wagner does not provide details about the other five incidents.  In a previous case filed
in this court, *Wagner v. Warden, et al.*, Civil Action No. ELH 14-791, Wagner alleged that the
correctional officers used excessive force against him on four occasions: October 31, 2013;
December 13, 2013; December 31, 2014; and January 1, 2014.  I granted summary judgment in
favor of defendants in that case, except for Wagner's claim that he was denied a contamination
shower after he was subjected to pepper spray on December 31, 2013.  That case is proceeding
against two of the more than fifty defendants Wagner originally named.

administrative remedy procedure ("ARP") requests.  ECF 1-1 at 3, ¶21.[7]  As Wagner was shoved into the cell, Rounds told him "'that shit just got a lot worse for you.'"  *Id.*, ¶ 22.  Wagner responded: "'Fuck you cowards.'"  *Id.*, ¶23.  An unidentified guard answered: "'Fuck you nigger.'"  *Id.*

When Mallow removed Wagner's leg restraints, Wagner attempted to run onto the tier toward the cameras to call for help, and so that someone could see what was happening.  ECF 1-1 at 3, ¶ 30.  He yelled, "'They trying to kill me-they trying to kill me[.]  Help.'"  *Id.*  Wagner avers that Iames instructed the other correctional officers to keep him inside the cell.  *Id.* at 4, ¶ 31.[8]  Mallow placed a tether on Wagner's restraints and, with Gilpin and Rounds, pulled him into the cell by his face, neck, tether, and arms.  *Id.*  During the struggle, Wagner injured his mouth when he "got swung into a wall" by Gilpin.  *Id.*, ¶ 37.  Wagner states that when he tried to spit blood from the wounds to his lips, Gilpin said: "'You black bitch you wanna spit.'"  *Id.*, ¶ 38.  Then, with "a closed fist," Gilpin punched Wagner in the eye and the bridge of his nose.  *Id.*  Rounds hit Wagner in the jaw and lower eye area.  *Id.*, ¶ 39.  Gilpin spit at Wagner and asked him how he liked it.  *Id.*, ¶ 40; ECF 1 at 3.  Officers Soltas, Dolly, and Iames dragged Wagner to the cell door and his restraints were removed through the door slot.  ECF 1-1 at 4, ¶ 42.

Wagner asserts, in part, ECF 1 at 3:

On 9/24/2014 after speaking with I.I.U. detective I was returned to the stripped isolation cell where I was told "I shouldn't have spoken to I.I.U. & that I just made shit worse on myself.[*]  Ofc. Rounds & Gilpin slammed my face into the

---

[7] Wagner does not allege he sustained actual injury as a result of the confiscation of his materials.  *See O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) ("Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show "actual injury" to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'") (quoting *Lewis v. Casey*, 518 U. S. 343, 355 (1996)).

[8] Wagner later told the IIU investigator that Iames directed the officers to keep him in his cell so that surveillance cameras would not capture the incident.  ECF 33-11 at 4.

> metal plate twice cutting and drawing blood both times.  I was then rammed face
> first into the wall busting my mouth/nose.  I was the [sic] punched with closed fist
> of Ofc. Gilpin & Rounds Sr., Gilpin then spit in my face as Rounds attempted to
> slam me on the metal bench when I tried to get out of the cell in front of the
> camera.  Sgt. Iames told them to keep me in the cell.  Gilpin, Rounds & Mallow
> pulled/held me by the cuffs, neck & tether cutting my wrist, arm & hands.  My
> eye was leaking blood from several 'holes'/cuts to left eye.  Sgt. Iames & CO
> Mallow did not stop this attack.  Iames actually encouraged the matter.  Other
> officers helped pull me to the slot only.  These officials are hurting me here.

Wagner claims that Rounds and Gilpin "repeatedly slammed [his] face and head into the

metal-steel plate located on the left of contingency cell #3" and "rammed" his face and head into

the steel plate.  ECF 1-1 at 3, 4, ¶¶ 24, 26, 46.  Further, Wagner claims that Rounds hit him with

his fist in the jaw and "lower eye area."  ECF 1-1 at 4, ¶ 39.  And, Gilpin "swung" Wagner into

the wall.  *Id.*, ¶ 37.  Gilpin, Rounds, and Mallow were holding and pulling Wagner's face, neck,

arms, and the tether.  *Id.*, ¶ 31.  In addition, Rounds and Gilpin used "the metal plate and wall as

the weapon" (*id.*, ¶ 47), which injured Wagner's left eye, nose, mouth, and temple.  ECF 1-1 at 3,

4, ¶¶ 25, 26, 28, 29, 46.  As a result of his injuries, Wagner became dizzy and momentarily lost

consciousness.  *Id*. at 3, ¶ 29.[9]

Plaintiff asserts that "Mallow and Iames witnessed the entire assault and did nothing to

preclude or prevent" it.  *Id.* at 5, ¶ 48.  Notably, Wagner acknowledges that "they did not

participate in the heart of the assault," but he complains that they failed to stop it and Iames

actually "encouraged" it.  *Id*.

Wagner claims that he was left in his cell bleeding and in pain.  It was not until his fellow

inmates caused a disturbance that he was taken to the medical unit for evaluation.  *Id*. at 4, ¶ 43.

Although Wagner does not specify the length of time he waited for a medical escort, his medical

records indicate that he was seen by Nurse Practitioner Janette Clark at 1:00 p.m., *i.e.*, within 45

---

[9] Wagner does not state how he became aware that he lost consciousness.

minutes of when the incident began.  ECF 28 at 7.  Soltas, Dolly, and Anderson told Wagner to put on a spit mask if he wanted to be seen in the medical unit.  Wagner cooperated and was placed in hand restraints cuffed from the back, leg irons and a spit mask.  ECF 1-1 at 4, ¶¶ 44, 45; *id.* at 5, ¶ 50.

According to Wagner, he was just standing and asking questions when, "without warning nor reason," Gilpin and Rounds slammed his face and head into a metal/steel plate, which cut his eye and temple area.  *Id.* at 4, ¶¶ 45, 46, 47.  Wagner faults Mallow, Iames, Soltas, Moore, and Dolly, who witnessed the incident, for failing to intervene.  *Id.* at 5, ¶¶ 48, 49.[10]  Wagner asserts a hand held video camcorder was used to record the incident. *Id.* at 6, ¶64.[11]  On September 30, 2016, Wagner wrote to Wayne A. Webb, Regional Executive Director, complaining about the incident.  ECF 33-19 at 21.

### B.  Medical Claim

Wagner avers that Defendant Janette Clark, a Nurse Practitioner, ignored his injuries. ECF 1-1 at 8, ¶ 83.

Wagner was escorted to the medical office for an "urgent visit" related to "use of force." ECF 28 at 7.  At approximately 1:00 p.m., *i.e.*, about 45 minutes after the incident, Wagner was seen by Clark.  ECF 28 at 7.  Wagner informed Clark that he was bleeding under the spit mask,

---

[10] Wagner also claims Gilpin, Rounds, Mallow, Soltas, and Iames have all repeatedly engaged in excessive force in the past, including sodomizing other prisoners.  ECF 1-1 at 5, ¶ 51. Notably, Wagner does not claim that he was sodomized.  Gilpin, Rounds, Mallow, and Iames deny sodomizing any inmate.  ECF 33-13, ¶ 8; ECF 33-14, ¶ 9; ECF 33-15, ¶ 5; ECF 33-16, ¶ 9. If Wagner intends to bring this claim on behalf of other prisoners, he may not do so here.  An inmate cannot bring claims on behalf of other inmates.  *See  Hummer v. Dalton*, 657 F. 2d 621, 625-26 (4th Cir. 1981); *Inmates v. Owens,* 561 F.2d 560, 563 (4th Cir. 1977).

[11] The DVD provided by the State defendants (ECF 33-5) appears to record the tier from stationary cameras at different angles and does not appear to have been made by a hand held camera.

felt dizzy, and had a severe headache.  ECF 1-1 at 5, ¶ 57; *id.* at 7, ¶ 79; *id.* at 8, ¶ 80; *see also* Wagner Declaration, ECF 1-1 at 27, ¶¶ 6, 8.  Officer Dolly told Clark that Wagner was bleeding from his eye and head.  ECF 1-1 at 8, ¶ 80; *see also* Wagner Declaration, ECF 1-1 at 27, ¶ 6.

Wagner asserts that Clark "neglected to treat plaintiff for possible concussion or other serious" injuries, even though she knew of the use of force against him.  Wagner Declaration, ECF 1-1 at 27-28, ¶ 9.  He also claims that Iames instructed Clark not to remove the spit mask in order to hide his injuries and that she "conspired" with  Iames by following his instruction.  ECF 1-1 at 5, ¶ 59; *id.* at 7, ¶ 78; *id.* at 8, ¶ 81; *see also* Wagner Declaration, ECF 1-1 at 27-28, ¶¶ 7, 9.  Wagner alleges that he vomited blood and claims that Clark did nothing to help him, other than wipe his hand, arms, wrists, and fingers.  ECF 1-1 at 8, ¶ 82.

Clark discharged Wagner with the assurance that she would send someone to his cell to check his mouth, head, and face.  ECF 1-1 at 5, ¶ 60.   "Nurse Rob" examined Wagner that same date but said there was nothing he could do for his eye.  *Id.* at 6, ¶ 65.

The next day, September 25, 2014, Wagner was brought to the medical room for complaints of vomiting blood and severe back pain.  ECF 33-10 at 1. He was seen by James Hunt, RN.  *Id.*

Wagner claims that he submitted multiple sick call slips for migraines, blurred and lost vision, eye pain, light sensitivity, and pain in his shoulder, hand, and back.  ECF 1-1 at 6, ¶ 61.  He also claims that his eye continues to swell and bleed, he continues to vomit blood, and he has severe back pain.  *Id.* at 8, ¶¶ 84, 86

Plaintiff acknowledges that he was provided bifocal eyeglasses on December 23, 2014, but claims that he continues to suffer light sensitivity and pain, headaches, and sees "constant spots."  ECF 1-1 at 8, ¶¶ 84, 86; *see also* Wagner Declaration, ECF 1-1 at 27, ¶ 6.  Notably, in

the ARP request that Wagner submitted on September 28, 2016, he acknowledged that Clark checked his vital signs.  ECF 33-19 at 1.

### C.  Due Process

Wagner alleges that, after the incident of September 24, 2014, he asked to make a statement and his request was denied.  ECF 1-1 at 6, ¶62.  He claims Soltas, Mallow, Dolley, Moore, and Iames failed to report their coworkers' use of excessive force and Rounds "perjured himself" by writing a false "rule infraction" based on the incident.  *Id.*

On the evening of September 24, 2014, Officer Earl "Ritchie"[12] delivered a notice of a disciplinary rule infractions to Wagner.  ECF 1-1 at 6, ¶¶ 66, 69.  Ritchie refused to give Wagner the notice to sign.  *Id.*  Instead, Ritchie wrote that Wagner had refused to sign it.  *Id.*  Wagner asserts that Ritchie refused to give him the notice because he was in a strip isolation cell and also to retaliate against him for past lawsuits he filed against Ritchie and other correctional officers.  *Id.* at 6, ¶ 69.

Wagner claims he was not notified of the charges against him, was deprived of an opportunity to request witnesses, and was not afforded a chance to present a defense.  *Id.* at 6, ¶ 68.  Moreover, he claims he was not allowed to attend the hearing on October 2, 2014, based on the "pretext" that he was on staff alert and deemed a threat to institutional security.  *Id.* at 7, ¶¶ 70, 71; *see also id.* at 6, ¶ 68.  Wagner disputes that he was on staff alert during this time. He states he was removed from the contingency cell and staff alert on September 29, 2014, prior to the adjustment hearing.  *Id.*, ¶¶ 70, 71.

The hearing officer found Wagner guilty *in absentia*, and Wagner claims that his constitutional right to be present was violated.  ECF 1-1 at 7, ¶ 71.  The hearing officer imposed

---

[12] Plaintiff uses three spellings for this individual:  "Richie," "Ritche," and "Ritchie." *See, e.g.*, ECF 1-1 at 6, ¶¶ 66, 69.

sanctions of 365 days of segregation and indefinite loss of visitation. *Id.*, ¶ 72.  Wagner appealed the decision.  *Id.*, ¶¶ 76, 77.  Warden Bishop denied the appeal and added 90 days of cell restriction to the sanctions imposed by the hearing officer.  *Id.*, ¶77; ECF 33-6.

Notably, Wagner sets forth allegations as to a violation of due process, but he never links the allegations to any of the named defendants.  His factual averments implicate unknown individuals who are not named as defendants.

### D.  Declarations of Other Inmates

Wagner has submitted declarations from inmates Ronnie Wimbush, Rodney Solomon, Tavon Singletary, Anthony Cohen, Courtny Campbell, and Derrick Dirton, whose writing is difficult to decipher. *See* ECF 1-1 at 38-54.  The pertinent portions of the declarations are summarized below.

Wimbush attests to witnessing Officer Gilpin "commit battery" against Wagner. Wimbush states Wagner was in restraints and leg irons at the time he was beaten.  According to Wimbush, Clark refused to provide medical care to Wagner.  ECF 1-1 at 38-39.  Wimbush does not state the date he witnessed these events, nor does he identify where he was located, so as to show that he was able to witness the alleged battery or Clark's medical evaluation of Wagner.

Solomon saw that Wagner's eye "was busted in several places."  He witnessed Wagner complain of lost and double vision, pain, and nerve damage.  He attests that at no time did Wagner receive notice of the disciplinary infraction, and states Wagner was denied the right to attend his hearing.  Solomon concludes he has personal knowledge that the rule violations against Wagner were fabricated and retaliatory.  ECF 1-1 at 40-42.

In his Declaration (ECF 1-1 at 43-46), Singletary states that he was assigned to a cell a few cells away from cell #3, where Wagner was housed on September 24, 2014.  He avers that

he saw Mallow, Rounds, and Gilpin grab Wagner.  Singletary also claims to have heard Wagner ask, "Why are you taking my mail[?]   I gotta answer those im litigating [sic]." *Id.* at 43. Singletary also heard an officer respond: "We know. . . . Shit just got bad for you." *Id.* Singletary lost sight of Wagner once he entered the cell with the officers, but he could hear a scuffle and he heard Wagner yell for help.

Singletary maintains that he "clearly" heard Wagner say "distressfully": "[T]hey split my shit open yo, I'm bleeding!" *Id.* at 44.  He also stated:  "[T]wo guys on the back wall were say [sic] Wagner is trying to get out [of] the cell they grabbing him, etc, etc." *Id.*  Singletary remembers that Wagner "scream[ed] out in pain" and, even when the cell door was secured, Wagner could be heard requesting medical attention for his eye, temple, nose, and bloody mouth. *Id.*  Wagner asked for a captain to make a report. *Id.*  But, the officers "merely walked off the tier." *Id.*  Inmates began to "beat and bang" to get medical help for Wagner. *Id.*  Three guards "finally came to get Wagner" for a medical escort. *Id.* at 45.  Wagner was handcuffed from behind his back, shackled at the legs, and was wearing a spit mask.  Singletary states Wagner did not move or attempt to threaten an officer or refuse direction. *Id.*

According to Singletary, he saw Wagner's face on September 30, 2014, and observed that his left eye was swollen shut and "cut up." *Id.* at 44.  He also observed that Wagner's right hand was bandaged and his left temple was swollen and badly cut. *Id.*

Anthony Cohen states that he was housed in cell 1-C-58 and heard a prisoner screaming "they trying to kill me, they bust my shit open." ECF 1-1 at 47.  Multiple prisoners were yelling "they're beating Uncle Yah Yah up again." *Id.*  Cohen states that he later found out that the prisoner was Wagner. *Id.*

Cohen does not state the date this happened.  But, he later indicates, "on information and belief," that a video was taken on September 24, 2014.  *Id.* at 48.  He also claims to have seen Mr. Wagner on September 29, 2014, with "cuts and abrasions" on his left temple and "gashes/cuts under and above his left eye."  *Id.*  And, according to Cohen, Wagner "was receiving little to no medical attention . . . ."  *Id.*  He also asserts that Wagner was not provided adequate pain medication for his injuries.  *Id.* at 49.

Courtny Campbell attests that on September 27, 2014, he "fished" paper, a pen, and ARP and medical forms to Wagner, who was in a strip isolation cell and had no access to his property.  ECF 1-1 at 51-52.  On September 28, 2014, Wagner "fished" Campbell handwritten legal papers to mail on his behalf.  *Id.*

Derrick Dirton filed an affidavit which is difficult to read.  As best as can be discerned, Dirton states that on September 24, 2014, he saw Wagner walk by his window.  Wagner had blood running down from the top of his head, face, and eye.  ECF 1-1 at 53-54.

## II.   Defendants' Responses

### A.  Janette Clark

In support of Clark's Motion (ECF 26), Clark did not file her own Declaration.  However, Clark filed thirty-four pages of Wagner's verified medical records (ECF 28),[13] along with an Affidavit executed by Robustiano Barrera, M.D., Medical Director of the Cumberland, Maryland Region for the Maryland Department of Public Safety and Correctional Services ("DPSCS").  ECF 26-5.  Dr. Barrera attests that Wagner has a medical history of joint pain, lower back pain, asthma, and vomiting blood, all of which existed prior to and are unrelated to the incident of September 24, 2014.  *Id.* at 1-2, ¶ 4.

---

[13] The medical records were filed under seal.

Wagner's medical records show that on September 24, 2014, at approximately 1:00 p.m., Wagner was taken to the medical unit.  ECF 28 at 7; *see also* ECF 26-5.  Wagner walked independently with a steady gait to the medical room.  He was "talkative" and responded appropriately to Clark's questions.  ECF 28 at 7; ECF 26-5, ¶ 5.  Clark observed a "dark color" on the front of the spit mask that Wagner was wearing.  ECF 28 at 7; ECF 26-5, ¶ 5.  Because of the spit mask, Clark was unable to examine Wagner's nose, mouth, and throat.  ECF 28at 8; ECF 26-5, ¶ 5.  However, Clark ordered nursing staff to follow up with Wagner to inspect his mouth once he was secured and unable to spit on staff.  ECF 28 at 8; ECF 26-5, ¶ 5.

Clark observed small abrasions during the physical exam and cleaned them with saline.  She observed there were two .3 cm abrasions on Wagner's left arm, with no bleeding.  ECF 28 at 7-8.  A 1.5 cm laceration on Wagner's right arm stopped bleeding on its own.  *Id.* at 8.  Clark determined sutures and dressing were not indicated.  *Id.*; ECF 26-5, ¶ 5.  Plaintiff's socks were removed because he complained of left ankle pain, but no swelling, bruising, or abrasions were observed.  ECF 28 at 8; ECF 26-5, ¶ 5.

Wagner reported pain at his left temple, but Clark observed no bruising, swelling, or bleeding in that area.  ECF 28 at 7.  Examination of Wagner's eyes revealed normal pupillary reaction and his extraocular muscles were intact.  *Id.* at 7-8; *see also* ECF 26-5.

That evening, at 8:04 p.m., Robert Claycomb, RN examined plaintiff for injuries to his "left eye area," right hand, mouth, and throat.  Claycomb cleaned the left "periorbital area" and applied antibacterial ointment.  ECF 28 at 9; ECF 26-5, ¶ 6.  Wagner's arm and hand abrasions were covered with Band-Aids.  Claycomb observed no open, bleeding areas in Wagner's mouth.  Wagner's right palm had a small, superficial scratch and there was a small nick in the skin.  Hunt applied Band-Aid adhesive strips to the areas.  Hunt inspected Wagner's mouth for open and

bleeding areas.  During the medical visit, Wagner voiced no further complaints.  ECF 28 at 9; ECF 26-5, ¶ 6.

On September 25, 2014, at 11:10 p.m., James Hunt, RN examined Wagner for a complaint of vomiting blood.  ECF 28 at 10.  Hunt found no source for the bleeding, but noted that staff indicated Wagner causes himself to bleed.  *Id.*  Hunt advised Wagner to increase his fluid intake and to call custody staff before throwing up.  *Id.*

Wagner's medical records show that he was seen repeatedly  by medical staff between September 24, 2014 and December of 2014, for complaints relating to his medical issues, which Dr. Robustiano states were preexisting and unrelated to the use of force incident.  These included back pain, vomiting, blood in his stool, asthma, psoriasis, and dental issues.  ECF 26-5, ¶ 7; ECF 28 at 10-34.  At his October 16, 2014 medical visit, Wagner was provided stool cards for his complaints of blood in his stool. ECF 28 at 13.   During his next visit on October 20, 2014, Wagner complained that he had been vomiting "for months."  ECF 28 at 15.  The record states that blood in the vomit was not observed.  *Id*.  A complete blood count ("CBC") and a comprehensive metabolic panel ("CMP") were ordered.  *Id.*  Wagner's medical record for October 27, 2014, indicates the stool cards returned positive for blood, and he was scheduled to see a physician. ECF 28 on 20.

On October 31, 2014, Ava Joubert, M.D. saw Wagner.   ECF 28 at 21-24.   Joubert concluded Wagner's bleeding was attributed to an adverse reaction to Motrin, which Wagner has taken for his psoriatic arthritis.  *Id*. at 22; ECF 33-20 at 8.  On December 1, 2014, Dr. Mahmood Ashraf, M.D, ordered an optometry consultation for Wagner to address his vision complaints. ECF 33-20 at 11.

Dr. Barrera opined, to a reasonable degree of medical probability, that Nurse Clark provided care to Wagner after the use-of-force incident that "was medically appropriate and within the applicable standard of care." ECF 26-5, ¶ 9. He rendered the same opinion as to care provided by other medical personnel. *Id.* ¶ 10.

### B. State Defendants

The State Defendants dispute Wagner's account of the incident on September 24, 2014. In support of the State's Motion, State Defendants Warden Frank B. Bishop, Jr.; Lt. Bradley A. Wilt; Sgt. Brian G. Iames; C.O. II Dean W. Rounds, Sr.; C.O. II Cody W. Gilpin; and C.O. II Warren G. Mallow have filed various exhibits, including declarations, a DVD video recording,[14] photographs of Wagner taken after the incident, verified medical and correctional records, and a copy of the lengthy IID report.

### 1. Serious Incident Report

The Serious Incident Report is dated September 24, 2014, at 2:09 p.m. ECF 43-1 at 1. It indicates that at approximately 12:15 p.m. on September 24, 2014, Gilpin, Rounds, and Mallow were returning Wagner to his cell in Housing Unit #1-C-3-S after an interview. ECF 43-1 at 3.[15] Wagner, who is a maximum security Level I inmate, was on staff alert status, in leg and hand restraints, with a security tether. Upon entering the cell, Wagner became verbally disruptive and threatened to spit on the officers. *Id*. Once in the cell, Wagner kneeled on the bunk so the officers could remove his leg restraints. Mallow removed the leg restraints, as Gilpin and

---

[14] The video of the incident is archived at 14-NB-68. ECF 43-1 at 3. As earlier noted, the recording is from the perspective of stationary cameras on the prison tier. If there was a hand held camera recording of the incident, as Wagner alleges, it was not provided to the IID investigator or to this court. ECF 43-1, Item 12.

[15] The State Defendants corrected Exhibit 1 (ECF 33-5) to substitute the Serious Incident Report. *See* ECF 43. Due to apparent inadvertent error, a document unrelated to this case was initially filed as Exhibit 1.

Rounds backed out of the cell while maintaining control of the security tether and Wagner.  At that point, Wagner turned his head toward Gilpin and Rounds and spit on them.  *Id.*  Gilpin and Rounds placed their hands on Wagner's shoulder to prevent any further assault.  The officers exited the cell while maintaining control of the security tether and walked Wagner back to the cell door.  Once the cell door was secured, Wagner began to resist staff by trying to pull away from the security slot.  After orders were given to remove the handcuffs, Wagner complied.  The restraints were removed and the security slot was secured.  *Id.*

The report does not indicate that Wagner was injured or needed medical treatment.  But, injury report packets were completed for Officers Gilpin and Rounds, both of whom refused medical treatment.  *Id.*

Wagner refused to provide a statement or cooperate for photographs.[16]  ECF 43-1 at 3; ECF 33-11 at 42 (Gilpin Information Report Form).[17]  The Offender's Statement Form, dated September 24, 2014 at 1:00 p.m., provides: "Inmate Wagner refused to provide a written statement." ECF 33-11 at 49.  Neither Wagner nor a witness to his refusal signed the document. *Id.*  Officer Cody wrote in the Notice of Rule Infraction, prepared on September 24, 2014, that Wagner refused to cooperate or allow photographs after the incident.  ECF 33-11 at 55.

At 1:15 p.m., IIU Detective Mack was notified about the incident by Captain Ronald Ketterman, and the incident was placed in the Barracks Log.  *Id.* at 3-4, 8; ECF 43-1 at 3.  The IIU Notification Report prepared for the incident states that Wagner provided a written statement

---

[16] The State Defendants appear to assert Wagner refused to permit photographs to be taken of him during the 7-3 shift.  However, Ames took two photographs of Wagner at 12:20 p.m. on September 24, 2014. ECF 43-1 at 13 (photos attached to Serious Incident Report). Additional photographs were taken during a later shift.  ECF 33-8 at 5-8 (photographs taken at 5:40 p.m. by Officer D. Meredith).

[17] The Information Report is unsigned.  Gilpin's name is typewritten as the reporting officer.

during the 3-11 shift.  ECF 33-8 at 1; ECF 33-11 at 4; *see also* 43-1 at 1 (Serious Incident Report).

### 2.  IIU Notification Report

Photographs were taken of Wagner and his cell (HU #1-C-3S) at approximately 5:40 p.m. on September 24, 2014.  ECF 33-8 at 5-10.  Wagner wrote an inmate statement alleging that officers on the 7-3 shift assaulted him, injuring the left side of his face.  *Id*. at 11.  The copy of Wagner's statement provided to the court is illegible.  ECF 33-8; *see also* ECF 33-2 n. 14.[18] Based on Wagner's allegations of assault and injury to his left eye, Lt. William Gillum compiled an IIU Notification Report on September 24, 2014, which he forwarded to Detective Christopher Burton at DPSCS.  ECF 33-7, ¶ 5.  The IIU Notification Report Form states that a Serious Incident Report was prepared during the 7-3 shift and assigned case number NBCI-14-045.  ECF 33-8 at 1.  Further, the form indicates that plaintiff was removed from his cell during the 3-11 shift, treated by medical staff, photographed, and returned to his cell without incident.  *Id.* [19]

### 3.  IID Report

#### a.  Interviews

IID Detective Burton interviewed Wagner on October 8, 2014.  Wagner's account of the September 24, 2014 incident, as recounted in the IID report, is consistent with his allegations in the Complaint.  ECF 33-11 at 6.  Therefore, I need not restate it.

---

[18]   NBCI Correctional Manager Randy Durst attests that Wagner's original statement could not be located.  The only copy available was a scanned copy that was digitally stored on the NBCI computer system.  ECF 33-9.

[19]   On October 8, 2014, at approximately 12:02 p.m., Assistant Warden Richard Miller contacted IIU to report that he received a letter from Wagner alleging that he had been assaulted by Iames; Rounds, Sr.; and Gilpin.  The investigation was assigned number DPSCS-IID #14-35-1038I/C.  ECF 33-11 at 2.

On October 14, 2014, Burton interviewed Iames, Gilpin, Rounds, and Mallow with respect to the incident of September 24, 2014.  The report summarizes the interviews as follows.

### 1.  Iames

Sgt. Iames said Wagner was escorted to his cell by Officers Rounds and Gilpin.  Rounds and Gilpin waited outside the cell with Wagner while Iames entered the cell to remove items Wagner was not permitted per staff alert procedures.  Wagner became agitated, informed the officers that he had AIDS and threatened to spit on them.  Iames left the cell to retrieve a spit mask and tether.  When he returned to the cell, the cell door had been secured and Wagner's leg irons and handcuffs had been removed.  Iames attempted to talk to Wagner through the door, but Wagner kept spitting blood on the cell window.  Iames asserted that "no one laid hands on Inmate Wagner; officers simply re-directed him and did not use force."  ECF 33-11 at 7.  Iames explained there was no Use of Force Report written because no force was used.  Iames states Wagner bit his own lip so that he could spit blood on the officers.  *Id.*

### 2.  Gilpin

Officer Gilpin told Burton that Wagner became very agitated as his property was removed from the cell. Wagner started to bite his lip and threated to spit at officers.  Iames left the cell to find a spit mask.  Gilpin and Rounds escorted Wagner into the cell.  Wagner refused to kneel on the bunk so that his leg irons could be removed.  Instead, Wagner lifted his legs up and the shackles were moved.  As Gilpin and Rounds escorted Wagner towards the cell door to remove the handcuffs, Wagner turned over his right shoulder and spit, hitting Gilpin on the right arm.  To stop Wagner from spitting, Gilpin extended his arms onto Wagner's back and right bicep to push him against the wall.  Gilpin said Wagner's chest was in contact with the wall, but his face did not hit the wall. Rounds maintained hold of Wagner's left arm.  Wagner continued to

spit.  Gilpin and rounds managed to back Wagner up to the cell door and he was secured.  As the slot in the cell door closed, Wagner spit blood, which hit Rounds's left arm.  Apart from Wagner's self-inflicted lip bite, Gilpin did not observe any bruising or other injury on Wagner. Gilpin indicated Officer Mallow was also present.

### 3.  Rounds

Officer Rounds told Detective Burton that Iames removed contraband items from Wagner's cell.  Wagner bit his lip, claimed he had AIDS, and threatened to spit.  ECF 33-11 at 8. Iames left the cell.  Rounds and Gilpin then escorted Wagner into the cell.  Rounds stated that either Iames or Gilpin removed Wagner's leg irons.  Once they were removed, Wagner turned and spit onto Gilpin's arm.  Rounds and Gilpin leaned Wagner against the wall.  Rounds does not recall Wagner's face hitting the wall.  While against the wall, Wagner continued spitting at the officers.  By the time Iames returned, Wagner was at the cell slot.  Rounds and Gilpin backed out of the cell, using a tether which was already attached between the handcuffs.  The cell door was secured and Wagner placed his hand in the cell slot to allow the officers to remove the handcuffs.  Once Gilpin removed the handcuff from Wagner's right arm, Wagner bit his lip and spit blood, hitting Officer Rounds on his left arm.  Rounds stated no other officers entered the cell, and he denied observing any officer assault or use excessive force against Wagner.  *Id.*

### 4.  Mallow

Officer Mallow stated that he assigned Cody and Gilpin to escort Wagner to his cell on September 24, 2014.  As they arrived at the cell, Wagner became verbally aggressive and threatened to spit in the officers' faces.  Consistent with "staff alert"[20] procedures, Iames entered Wagner's cell and removed Wagner's property.  ECF 33-11 at 9.  After Iames exited, Gilpin and

---

[20]   The State Defendants did not submit the staff alert policy as an exhibit.

Rounds escorted Wagner into the cell.  Mallow removed Wagner's leg irons.  Once the leg irons were removed, Gilpin and Rounds attempted to back Wagner to the cell door to remove the handcuffs and security tether.  Wagner turned over his right shoulder and spit at the officers, striking Gilpin and Rounds.  Gilpin and Rounds redirected Wagner toward the cell wall to prevent further assault.  Wagner was backed to the cell door and the door was secured.  Wagner placed his arms in the security slot and Officer Mallow started to remove the handcuffs.  Wagner began pulling his arms inside the slot to break away.

Using the security tether, Mallow maintained control over Wagner and ordered him to stop.  Wagner complied and the security slot was secured without further incident.   Mallow denied that he slammed Wagner's head into the wall.  Moreover, Mallow claimed he did not observe any other officer strike, hit, or slam Wagner.

The IID Report reads, ECF 33-11 at 9:

Officer Mallow advised that none of the officer [sic] struck or hit Inmate Wagner. In addition, Officer Mallow advised that a few minutes after the incident, he went back to the cell to speak with Inmate Wagner.  Officer Mallow stated the he told Inmate Wagner that he did not have any problems with him and informed him that he needed to calm down.

### b.  Video Recording

Detective Burton reviewed surveillance video which provided three angles of C-Wing: the lobby, bottom tier, and the top tier.  His report summarizes the chronology of the recording, which I have rephrased slightly.  *See* ECF 33-11 at 10-11; *see also* ECF 33-12.

12:08:50 p.m. — Inmate Wagner is escorted to C-Wing by custody staff. Officer Rounds is holding onto Wagner's left arm while Officer Gilpin holds onto his right arm.

12:09:14 p.m. — The escorting officers arrive at Cell 1-C-3.  Sgt. Iames and Officer Mallow walk towards the cell.

12:09:19 p.m. — IIU Detective Corey McKenzie leaves H.U. #1, and Sgt. Iames enters Cell 1-C-3.  Officers Rounds, Gilpin, and Mallow remain outside of the cell with Wagner.

12:10:48 p.m. — Sgt. Iames exits the cell with Wagner's property, walks away to retrieve a cart, and re-enters the cell at 12:11:08 p.m.

12:12:35 p.m. — Sgt. Iames exits the cell with additional property in his hand, places the items on the cart, and walks beyond the view of the surveillance camera, while plaintiff is escorted into the cell by Officers Rounds and Gilpin.  Officer Mallow followed close behind them.

12:13:05 — Sgt. Iames enters the surveillance camera's coverage, and stood outside the doorway of Cell #1-C-3.

12:14:04 — Sgt. Iames walks away from the cell, exits C-Wing and enters the lobby and out of the surveillance camera's view.

12:14:45 p.m. — Officers are observed backing out of Cell #1-C-3.

12:14:58 p.m. — Sgt. Iames returned to C Wing with a spit mask. Two additional officers arrive on the scene. The cell door appears to be closed and the officers are standing outside of the door.

12:15:44 p.m. — Officer Gilpin, Officer Rounds and two additional officers walked away from the cell towards the lobby area. Officer Gilpin was inspecting his right arm and Officer Rounds was inspecting his left arm. Sgt. Iames and Officer Mallow remained at the cell and appeared to be speaking to Wagner through the cell door.

12:16:10 p.m. — Sgt. Iames walked away from Cell #1-3-C.  Officer Mallow remained on C-Wing.

12:17:03 p.m. — Officer Mallow was observed standing outside the door of the cell.

12:17:34 p.m. — Mallow walks away from the cell door.

12:19:33 p.m. — The video concluded.

Most important, the IID investigator observes that the surveillance video does not capture

the view inside Wagner's cell where the assault is alleged to have occurred.  ECF 33-11 at 12.

The recording adds little to the court's consideration of Wagner's claims because it does not show what occurred inside Wagner's cell on September 24, 2014.  Additionally, it fails to identify the individuals depicted and does not include audio.  In short, it affords little insight into the incident.

### c.   Photographs

There are five photographs in the IID investigation Report.  ECF 33-11.  A color copy of a photograph in the IID Report shows lacerations on Wagner's arm.  ECF 33-11 at 64.   The other photographs included in the report are a black and white copy of Wagner's face (ECF 33-11 at 21);[21] a color photograph showing a side view of Wagner seated wearing a spit mask (ECF 33-11 at 63), and a color photograph of Wagner's arm with a BandAid.  ECF 33-11 at 68. Notably, the IID Report *does not* include additional photographs that are part of the record in this case.  *See* ECF 33-8 at 5-8.  These photographs show abrasions above and below Wagner's left eye, as well as blood in his temporary holding cell.[22]

### d.   IID Report Conclusions

After conducting interviews and reviewing the videotape, Clark's medical report, and facility reports pertaining to the incident, Detective Burton determined Wagner's reported injuries were inconsistent with Clark's medical finding on September 24, 2014.   Burton recommended closing the case because there was insufficient evidence to advance the investigation with charges and prosecution. ECF 33-11 at 12.

### 4.  Declarations

---

[21]   This photograph appears to be a copy of Wagner's prisoner identification photograph. ECF 33-11 at 21, 22-29, 57 (displaying photograph on prison case management records).   It is unclear when this photograph was taken.

[22] The IIU investigator requested the photographs taken from both the 7-3 and 3-11 shifts. ECF 33-19 at 11.

The State Defendants filed the declarations of Lt. William Gillum, Officer Rounds, Officer Gilpin, Officer Mallow, Sgt. Iames, and Warden Bishop.

Gillum avers that on September 24, 2014, on the 3-11 shift, he was notified that Wagner was complaining of an injury caused by officers on the previous 7-3 shift.  ECF 33-7.  Wagner was removed from his cell and escorted to the medical room for examination, photographs were taken of the cell and Wagner's injuries, and Detective Christopher Burton of the IID was contacted.  *Id.* ¶¶ 3, 4, 5.

Rounds attests that the Serious Incident Report he wrote on September 24, 2014, is true and accurate.  He denies pushing, striking, or slamming Wagner's face into a metal plate.  ECF 33-13 ¶¶ 3, 4.  Rounds also denies threatening Wagner on September 24, 2014, as he alleges in his complaint, or making racist remarks, or warning him that he should not have spoken to IIU representatives.  Rounds denies retaliating in any way against Wagner for speaking to IIU representatives.  *Id.*  ¶9.

Gilpin attests that the Serious Incident Report he wrote on September 24, 2014, is true and accurate.  He denies destroying, stealing, or in any way interfering with Wagner's filing of ARP requests, threatening Wagner as he alleges, or making racist comments to him.  ECF 33-14, ¶¶ 3, 4, 6.  Gilpin denies that he or anyone else in his presence ever slammed Wagner's head and face into a metal plate.  *Id.*  ¶ 6.  Gilpin states that at no time has he ever spit on Wagner or any other inmate.  *Id.*  ¶ 7.  Further, he denies retaliating against Wagner for speaking to the IIU.  *Id.* ¶ 10.

Mallow attests to the veracity of the Serious Incident Report he wrote and signed on September 24, 2014.  He denies grabbing Wagner by the neck or face or striking, punching, or hitting him on September 24, 2014.  ECF 33-15 ¶3.  Mallow also maintains that he did not

threaten or harass Wagner.  *Id.* ¶4.  Further, Mallow claims he did not retaliate in any way against Wagner for speaking to an IIU representative *Id.* ¶ 6.

Iames denies threatening Wagner, as alleged in the Complaint, or retaliating against him for speaking to an IID representative.  ECF 33-16, ¶¶ 2, 4.  He states that he never grabbed Wagner by the neck, as alleged.  *Id.* ¶ 6.  Iames asserts that he did not destroy, steal, or interfere with Wagner's ARPs.  Iames denies witnessing an assault on Wagner on September 24, 2014, and failing to intervene.  He attests: "I did not see any of the officers strike, hit, or punch Mr. Wagner."  *Id.* ¶ 5.  He maintains that he never witnessed the use of excessive force against Wagner.  *Id.* ¶ 8.  Moreover, Iames claims that he never denied or interfered with Wagner's medical treatment.  *Id.* ¶ 7.  Further, he denies removing or destroying Wagner's legal materials, writing materials, or his asthma medication, as alleged in the Complaint.  *Id.* ¶ 10.

Warden Bishop states that it is beyond the scope of his duties as Warden to perform or prescribe medical treatment for an inmate.  Bishop has no authority to influence the medical decisions of private health care providers who contract with the State of Maryland to provide medical care for inmates.  ECF 33-17.  Bishop attests he has not been involved, interfered with, or delayed Wagner's medical care.  *Id.* ¶ 8.  Bishop also states he has no knowledge that staff under his authority interfered with or delayed medical care to Wagner or used excessive force against him.  *Id.* ¶¶ 9, 11.

### 5.  Photographs

Photographs taken by Officer D. Meredith at 5:40 p.m. on September 24, 2014, show the area below Wagner's eye.  It is red, swollen, and abraded.  ECF 33-8 at 5-8.

### 6.  Rule Infractions

Gilpin and Rounds prepared infraction notices charging Wagner with the violation of inmate rules #100 (involvement in disruptive activity); #101 (assault or battery on staff); #312 (interfering with or resisting the duties of staff); #400 (disobeying a direct lawful order); and #405 (exhibition, demonstration, or conveyance of insolence, disrespect, or vulgar language). ECF 33-6 at 2, 5.  Plaintiff was placed on administrative segregation status pending adjustment. *Id*. at 4, 7.

At 3:50 p.m. on September 24, 2014, Officers E. Ritchie and J. Dolly served Wagner with the infraction notices.  ECF 33-6 at 3, 6.  Wagner refused to sign the notices.  He did not request a representative, witnesses, or seek to present any evidence.  *Id*. at 3, 6, and 8.

Wagner refused to attend his adjustment hearing on October 2, 2014, thereby waiving his appearance.  ECF 33-6 at 4, 6, 8, 9.  Hearing Officer David Sipes credited evidence showing Wagner was disruptive and assaulted staff by spitting, interfering with staff duties, disobeying direct orders, and using disrespectful language.   Sipes found Wagner guilty and imposed sanctions of 365 days of disciplinary segregation, consecutive, for violation of Rule #100; 365 days, concurrent, for violation of Rule #101; and 60 days, concurrent, for violation of Rule #312. *Id.* at 9-10.  Sipes did not revoke diminution credits.  *Id.* at 10.  Wagner also received a mandatory indefinite suspension of visits for the violation of Rule #100 with an eligible reinstatement consideration date of April 2, 2016.  *Id.* at 11.  Sipes commented that Wagner also should have been, but was not, charged with violation of Rule #104 (use of threatening language).  *Id*. at 10.  Sipes noted that Wagner had been involved in three assaults on staff in 2014, and had a poor adjustment history.  *Id*. at 10.

Wagner was served with a copy of the hearing decision later that day, by Officer Self.  *Id*. at 12.  Wagner refused to sign the notice of receipt of service.  *Id*. at 12.

On October 21, 2014, Warden Bishop added 90 days of cell restriction to the sanctions imposed by Sipes.  *Id*. at 1.[23]

### III. Non-Dispositive Motions

### A. Motion for Temporary Restraining Order or Preliminary Injunction

As earlier noted, Wagner included with his Complaint an "Order To Show Cause And Temporary Restraining Order" (ECF 1-1 at 22), a memorandum in support (ECF 1-1 at 23-26), and his Declaration.  ECF 1-1 at 27-29.  In particular, Wagner asked for a temporary restraining order or preliminary injunction requiring his transfer to another prison, compelling physical therapy, pain medication, a medical evaluation by a qualified orthopedist and neurologist, and appropriate medical care.  ECF 1-1 at 22; 28-29.  Then, on March 21, 2016, Wagner filed a motion for a restraining order (ECF 8), with two supporting declarations.  *See* ECF 8-1; ECF 8-2. The submissions repeat many of the same allegations and claims.

Wagner alleges that he has not been provided with adequate medical care and asserts that he has been denied appropriate protection from future harm or attack.  ECF 1-1 at 23; ECF 8-1. He claims that since the incident on September 24, 2014, he continues to suffer pain, stiffness, and limited motion in his left shoulder, back pain, numbness and tingling on his left side, migraines and sensitivity to light, cannot walk properly, vomits blood, and has blood in his stool. ECF 1-1 at 22; *id.* at 28.  Further, Wagner maintains that he is denied physical therapy, necessary medical tests, an MRI, and consultation with appropriate medical specialists.  ECF 1-1 at 23; ECF 1-1 at 28, ¶¶12, 13, 14; ECF 8-1 at 1.  Wagner asserts his medical complaints are ignored or

---

[23]  Wagner claims Bishop is responsible for reviewing all administrative appeals of disciplinary charges filed by NBCI inmates.  ECF 1-1 at 2, ¶ 8.

treated with Tylenol.  ECF 1-1 at 23; ECF 8 at 2.  Moreover, Wagner is concerned that his vomiting of blood may be a symptom of cancer.  ECF  1-1 at 28; ECF 8-2, ¶16.  He claims he continues to deteriorate from his ailments.  ECF 8 at 1; ECF 8-2 at 3, ¶ 16; ECF 1-1 at 28, ¶15.

In addition, Wagner claims that he is subjected to torture and harassment at NBCI.  ECF 1-1 at 28-29, ¶ 19.  He alleges that a "half dead" mouse was placed in his food and he is falsely accused of  rule infractions.  ECF 1-1 at 19, 23.  According to Wagner, the cell extractions are "contrived" and he is "constantly" subjected to the use of pepper spray.  ECF 8 at 2; ECF 8-2, ¶ 12.  Moreover, Wagner claims that Rounds, Gilpin, and Mallow wrongfully confiscated or destroyed his legal materials. ECF 8-2, ¶ 15.  He suggests that because he has sued officers in the past for excessive force, he is no longer safe in their custody.  ECF 8 at 2; ECF 8-2 at 3, ¶ 20.  According to Wagner, officers have solicited other inmates to harm him and placed another inmate in a cell near his to flood his cell with fecal material and urine.  ECF 8-2 at 3, ¶¶ 14, 17.

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 129 S.Ct. 365, 374 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

A movant must show that the irreparable harm he faces in the absence of relief is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir.1991) (citation omitted). In the prison context, courts grant

preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

Wagner's allegations fail to show that he is likely to suffer irreparable harm absent a grant of preliminary relief, or that an injunction is in the public interest.  Wagner's self-serving and speculative allegations concerning his safety in light of his litigation are insufficient to merit the extraordinary relief necessary for issuance of a preliminary injunction.  Insofar as Wagner challenges the adequacy of the medical care he is receiving, he provides insufficient evidence to demonstrate the likelihood of suffering irreparable harm absent preliminary relief.  Further, Wagner does not provide sufficient information to  establish that the balance of equities is in his favor.

In sum, Wagner has not satisfied the requirements for issuance of the extraordinary remedy of preliminary injunctive relief.  Therefore, his motion (ECF 8) will be denied.

### B.  Motion to Preserve Evidence

Wagner has filed two separate motions to preserve evidence.  ECF 16; ECF 36.  I consider each one separately.

#### 1.  First Motion to Preserve Evidence

The first Motion to Preserve Evidence (ECF 16) refers the court to Wagner's supporting Declaration.  *See* ECF 16-1.  In the Declaration, Wagner attests that "while litigating"  he has been subjected to attacks, "harassments," denial of food, denial of medical care and medications, denial of showers, cell restrictions, and fabricated rule violations.  *Id.*, ¶¶ 3, 4, 5.  Some of

Wagner's allegations appear to refer to incidents that allegedly took place in February 2016, which are not at issue here.[24]

Wagner states that on February 24, 2016, he was sick and repeatedly vomited blood, but was denied medical care by medical officers on the 3-11 shift.  *Id*. at 1-2, ¶¶ 5, 6.  Although Wagner was taken to the medical unit for evaluation, he received no treatment.  *Id*. at 2, ¶ 8. Upon returning to the tier, Wagner informed his fellow inmates that he had not received any medical care.  As a result, they threw trays, water, and urine at cell guards and flooded the tier. *Id*. at 2, ¶ 9.  Wagner claims he was "extracted and subjected to chemical exposure not telling those prisoners to cooperate & because I wanted/needed medical, if not, hospital attention."  *Id*. at 2, ¶10.

While Wagner was in an isolation cell, correctional officers Dustin Gursky, Dean W. Rounds, Sr. , Warren G. Mallow, Cody W. Gilpin, Janet M. Puffenbarger, Sgt. Charles Bielanki, and Property Officer Bennett allegedly "stole" his legal papers, stamps, writing supplies, and political books.  *Id*. at ¶¶ 12, 19.  Wagner states he has requested photographs and video recordings, written statements, and other evidence of his vomiting, the extractions, and his inadequate medical care, which were denied.  *Id.* ¶¶ 20, 21.  He also attests that he "has reason to believe as in so many of [his] abuse run-ins at NBCI and previous litigations, the evidence in those cases were allegedly not archived, lost, falsified/altered, or destroyed."  *Id*. at ¶ 22. Wagner fears that, "[u]pon information, belief, and personal knowledge this crucial evidence" will be "destroyed."  ECF 16-1, ¶ 22.

---

[24]   To the extent Wagner is attempting to allege claims concerning events in February 2016, he may not do so here.  He may, however, present his claim by filing a separate complaint.

Wagner provides no specific evidence to support his allegations of spoliation. And, the evidence at issue concerns matters that occurred in February 2016, which are not at issue in this case. Accordingly, the motion (ECF 16) will be denied, without prejudice.

### 2. Second Motion to Preserve Evidence

Wagner titled his second motion as one to preserve evidence. ECF 36. But, his Declaration (ECF 36-1) pertains to his request for discovery. *Id.* As discussed, *infra*, counsel will be appointed in this case, and a scheduling order shall be entered. Therefore, Wagner's motion will be denied, without prejudice to refiling by appointed counsel, if deemed necessary.

### III. Motions to Dismiss or for Summary Judgment

### 1. Standards of Review

Defendants' motions (ECF 26; ECF 33) are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.

A motion to dismiss pursuant to Rule 12(b)(6) tests the adequacy of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Such a motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed.R.Civ.P. 8(a)(2). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 n. 3 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).

*Twombly,* 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, —— U.S. ——, 135 S.Ct. 346, 346 (2014) (per curiam). But, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir.2013). To satisfy the minimal requirements of Rule 8(a) (2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556. In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id*. at 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing a Rule 12(b)(6) a motion, a court " 'must accept as true all of the factual allegations contained in the complaint,' " and must " 'draw all reasonable inferences [from those facts] in favor of the plaintiff.' " *E.I. du Pont de Nemours & Co*., 637 F.3d at 440 (citations omitted); *see Kendall v. Balcerzak,* 650 F.3d 515, 522 (4th Cir.), *cert. denied*, 132 S.Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385–86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010). However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Twombly*, 550 U.S. at 555. Moreover, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385–86.

A Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). "A court decides whether [the pleading] standard is met by separating the legal conclusions from

the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir.2011), cert. denied, —— U.S. ——, 132 S.Ct. 1960 (2012). " 'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.' " *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201–02 (10th Cir.2011) ( "Dismissal is appropriate if the law simply affords no relief.").

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards*, 178 F.3d at 243 (quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. *See Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc ). "This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear [ ] on the face of the complaint,' "or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir.1993)) (emphasis in *Goodman* ).

Generally, a court's consideration of a Rule 12(b)(6) motion is confined to facts alleged in the operative pleading.   A court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).   But, a court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the defendant's motion, "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*,

572 F.3d 176, 180 (4th Cir. 2009); *see also Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *E .I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435,448 (4th Cir. 2011). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.' " *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original); *see also New Beckley Mining Corp. v. UMWA*, 18 F.3d 1161, 1164 (4th Cir. 1994) (holding district court did not err in relying on document that plaintiff referred to in its complaint to justify cause of action).

A motion styled in the alternative, either to dismiss or for summary judgment, implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, ____ Fed. App'x ____, 2016 WL 6958439, at *2-3 (4th Cir. Nov. 29, 2016) (per curiam). When the movant expressly captions the motion "in the alternative," as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d)

may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[25]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries*, Inc., 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638-39 (4th Cir. July 14, 2016); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv.*

---

[25] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC, supra*, at *2 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

*Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for

summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. Id. (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrod*s, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. Appx. at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. Appx. at 638.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club*, *Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the

evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion,* 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, and of import here, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a genuine dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

Both sides have submitted many exhibits.  With respect to defendant Wilt, I am satisfied that it is appropriate to address the State's Motion in the context of Rule 12(b)(6).  As to the remaining defendants, I shall construe their motions as ones for summary judgment, because this will facilitate consideration of the issues presented in this case and will advance the progress of the case.

### IV.   Discussion

### 1.  Bradley Wilt

The State Defendants moved for dismissal of Bradley Wilt, as no claims are raised against him.  ECF 33-2 at 30-31.  As no claims are raised against Defendant Wilt in the text of the Complaint or the attachments filed by Wagner,  I shall dismiss him as a party to this action, pursuant to Rule 12(b)(6).

### 2.  Janette Clark

Wagner alleges that he told Clark that force had been used against him, yet she provided no medical care for his injuries.  ECF 1-1 at 27, ¶ 9 (Wagner Decl.).

### (a)

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions

of the defendant or her failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).   The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219.   A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225.   Put another way, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

The Fourth Circuit has said:   "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*,

129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), resonates here: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

Further, with regard to medical care providers, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the

40

subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835).  A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Moreover, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

Even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted."

*Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (*overruled in part on other grounds by Farmer,* 511 U.S. at 837. But, of significance here, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Thus, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986). And, disagreements between an inmate and medical staff as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

**(b)**

Wagner claims he vomited blood and Clark did nothing to help him, other than wipe his hand, arms, wrists and fingers. ECF 1-1 at 8, ¶ 82. He also avers that Clark ignored his injuries. *Id.* at 8, ¶ 83. Wagner faults Clark for releasing him "to his attackers without any pain medication, treatment, checked him for concussion or other plausible damage." *Id.* at 8, ¶ 82. Wagner also claims that Iames instructed Clark not to remove the spit mask in order to hide his

injuries and that she "conspired" with Iames by following his instruction.  ECF 1-1 at 5, ¶ 59; *id.* at 7, ¶ 78; *id.* at 8, ¶ 81; *see also* Wagner Decl. ECF 1-1 at 27-28, ¶¶ 7, 9.

As noted, Wagner's medical records indicate that he was "talkative" and responded appropriately to medical questions during his medical evaluation after the incident.  ECF 28 at 7.  Moreover, contrary to Wagner's claims, Clark did not ignore his complaints of injury.  Clark found that Wagner's breathing was normal and his lungs were clear.  ECF 28 at 7; *see also* ECF 26-5.  She observed a dark color in front of the spit mask and arranged for a follow-up medical visit once Wagner was secured without the ability to spit.  She also noted two small abrasions on his left forearm, and cleaned his hands with saline.  ECF 28 at 7.  Wagner reported pain near his left temple and left ankle, but Clark observed no bruising, swelling, or edema.  *Id* at 7, 8.

The record does not substantiate Wagner's claim that he vomited blood.  Wagner's self-reported assertion that he sustained a concussion is unsubstantiated.  And, later on the day of the incident, Robert Claycomb, RN examined Wagner's left eye, right hand, mouth. and throat.  ECF 28 at 9.  Claycomb took Wagner's vital signs (*id.*) and observed no open, bleeding areas.  *Id.*  He cleaned the area above Wagner's left eye and applied Bacitracin and gauze.  *Id.*  The following day, September 25, 2014, Wagner was seen by James Hunt, RN for "blood on the floor."  ECF 28 at 10.  His vital signs were checked.  No source of bleeding was found.  *Id.*

Contrary to Wagner's assertions, Clark evaluated and treated Wagner's reported complaints.  Clark's medical assessment and treatment included checking his vital signs, examining the areas where Wagner complained of pain (head and ankle), and cleaning the abrasions on his arm.[26]  Clark did not ignore Wagner's injuries.  After Wagner was secured in his

---

[26] Indeed, Wagner acknowledged in an ARP filed in October 2014 that Clark checked his vital signs after the incident.  ECF 33-19 at 1.

cell, he was provided a follow-up examination later that day from Nurse Claycomb, as Clark had prescribed.

Although Clark has not submitted a Declaration, Officer Iames disputes Wagner's assertion that he ordered Clark not to remove the spit mask in order to hide Wagner's injuries. Iames attests that he has never denied or interfered with Wagner's receipt of medical treatment. ECF 33-16, ¶ 8.  Apart from Wagner's bald allegation, there is no evidence to suggest Iames and Clark conspired to conceal Wagner's alleged injuries under the spit mask or to deprive him of medical care.

Viewing the evidence in the light most favorable to Wagner, Clark's actions do not amount to deliberate indifference to serious medical needs.  Clark assessed Wagner's medical condition, provided treatment, and arranged for his follow-up care, which was administered.  The care provided does not suggest  the sort of "subjective recklessness" required to show deliberate indifference. *Farmer*, 511 U.S. at 839–40.  Rather, Wagner's claims reflect disagreement about the proper course of treatment.  Such disagreement does not establish an Eighth Amendment violation. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Clark's medical assessment and treatment on September 24, 2014, may have failed to meet Wagner's expectations of care, but it did not violate his rights under the Eighth Amendment.   Accordingly, I will grant Clark's motion for summary judgment and enter judgment in her favor.[27]

---

[27] Wagner's claims that he has since submitted multiple sick call slips for migraines, blurred and lost vision, eye pain, light sensitivity, and pain in his shoulder, hand and back do not specifically implicate Clark.  ECF 1-1 at 6 ¶61, at 8 ¶¶ 84, 86.  If he wishes to pursue these claims, he may do so in a separately filed complaint which names the specific individuals he alleges who have denied him adequate medical treatment.

### 3. Warden Bishop

Wagner seeks to hold Warden Bishop culpable because he "is responsible for the daily over-all operations and for the welfare of each prisoner…." ECF 1-1 at 2, ¶ 8. Wagner also claims that Bishop "is responsible for reviewing all administrative appeals of disciplinary charges filed by NBCI prisoners." *Id*. Wagner faults Bishop for failing to take disciplinary action against Defendants or acting to control their "unremitting abussive [sic] . . . behavior." *Id*. at 5, ¶53. However, Wagner does not claim that Bishop was personally involved in unconstitutional conduct.

In actions under 42 U.S.C 1983, the doctrine of respondeat superior does not apply. Rather, supervisory officials can be held liable only for their personal wrongdoing or for supervisory actions where they are aware that their subordinates have engaged in pervasive and unreasonable unconstitutional conduct. *See Monell v. New York Dep't. of Soc. Ser*., 436 U.S. 658, 691 (1978); *Love-Lane v. Martin*, 355 F.3d 266, 282 (4th Cir. 2004); *Shaw v. Stroud*, 13 F.3d 791, 799, *cert. denied*, 513 U.S. 813 (1994). For liability to exist under §1983, there must be personal involvement by a defendant in the matter alleged.

As the Fourth Circuit has explained, liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). In *Shaw v. Stroud*, *supra*, 13 F.3d at 799, the Fourth Circuit set forth three elements that a plaintiff must prove to establish supervisory liability under § 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*See also King*, 825 F.3d at 224 (applying the *Shaw* elements); *Armstrong v. City of Greensboro*, ___ F. Supp. 3d ___, 2016 WL 3167178, at *11 (M.D.N.C. June 6, 2016) (same); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 (D. Md. 2015) (same), *aff'd*, 644 F. App'x 243 (4th Cir. 2016), *cert. denied*, ___ U.S. ___, 2016 WL 5874521 (Dec. 5, 2016).

To satisfy the first element, a plaintiff must show "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Shaw*, 13 F.3d at 799 (citing *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)). And, establishing a "pervasive" and "unreasonable" risk of harm "requires evidence that the conduct is widespread, or at least has  been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799.

Wagner has posited only bald allegations but no evidence that Bishop was aware of a pervasive or widespread problem relevant to the alleged excessive force.  Bishop attests in his Declaration (ECF 33-17) that he had no knowledge of any staff member under his authority using excessive force against Wagner on September 24, 2014.  Bishop also explains that allegations of use of excessive force are forwarded to the IID for investigation, and he has no information from the IID indicating that excessive force was directed against Wagner on September 24, 2014.  *Id.*  To the extent that Wagner faults Bishop for medical care he received or was purportedly was hindered from receiving, Bishop attests that he is not a trained health

care provider.  It is beyond the scope of his duties to dictate the type of medical treatment given an inmate.  *Id.*  Moreover, the medical record reflects that Wagner received constitutionally adequate medical care.

To be sure, Bishop added 90 days to the cell restrictions imposed on Wagner by the hearing officer.  But, Wagner does not allege facts to show that Bishop's actions violated his constitutional rights.  Nor has Wagner set forth facts linking Bishop personally to the denial of due process with respect to the hearing for the rule infractions.

As to Bishop personally, there is no genuine dispute of material fact with regard to the issues of use of excessive force and denial of adequate medical care.  Therefore, Bishop is entitled to summary judgment as to those claims.  With respect to the due process claim, Wagner has set forth facts that, if proven, might amount to a denial of due process.  But, he has not set forth facts implicating Bishop with regard to that claim.  Therefore, as to the due process claim, I shall grant the motion to dismiss, with leave to amend.

### 4.   Remaining State Defendants (Iames, Rounds, Gilpin, Mallow)

### a.   Use of Excessive Force

Wagner maintains that he was attacked without provocation or warning.  ECF 1-1 at 4, ¶¶ 45, 46.  Careful review of the factual allegations reveals that this claim is directed at Gilpin and Rounds.

According to Wagner, he was injured when Gilpin and Rounds repeatedly slammed his face and head into the metal plate located on the left side of the contingency cell and pushed him into the wall.  ECF 1-1 at 3, ¶¶ 24, 25, 26, 28.  Wagner asserts that after he tried to spit blood at one of the officers (*id*. at 4, ¶38), Gilpin punched Wagner in his eye and the bridge of his nose (*id*.) and Rounds hit Wagner in the jaw and lower eye area.  *Id*., ¶39.  Gilpin also spit in

Wagner's face and asked him how he liked it.  ECF 1-1 at 4, ¶ 40.  Moreover, Mallow tethered him and pulled him by his neck.  *Id.* at 3-4, ¶¶ 18, 30, 31.  According to Wagner, Mallow and Iames failed to protect him and did not attempt to stop the assault.  *Id.* at 5, ¶ 48.

Photographs taken of Wagner at 5:40 p.m. on the day of the incident clearly show the area around Wagner's left eye, and particularly below the eye, is red, swollen, and abraded.  ECF 33-8 at 5-8.  The demonstrated injury, although perhaps not serious, is consistent with Wagner's claim of assault.

Essentially, the State Defendants deny the use of force incident.  Rounds and Gilpin have filed declarations denying they pushed or struck Wagner.  They also deny slamming Wagner into a metal plate.  ECF 33-13, ¶¶ 3,4; ECF 33-14, ¶¶ 3, 4, 6.  Gilpin denies spitting on Wagner.  ECF 33-14 ¶ 7.  Iames denies striking Wagner or witnessing the use of excessive force against Wagner by staff on September 24, 2014.  ECF 33-16, ¶¶ 5, 8.

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment.  *See Whitley v. Albers*, 475 U.S. 312, 391-21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam); *Hudson v. McMillan*, 503 U.S. 1, 7-9 (1992).  "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners."  *Farmer*, 511 U.S. at 832; *see also Makdessi,* 789 F.3d at 132. The use of force by a prison official violates an inmate's Eighth Amendment rights when such force is "inconsistent with contemporary standards of decency," *Estelle*, 429 U.S. at 103, or is "'repugnant to the consciousness of mankind.'"  *Wilkins*, 559 U.S. 38 (citation omitted).

The Eighth Amendment inquiry asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on  the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 297.

In a claim for excessive application of force, the question is whether the correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," or "in a good-faith effort to maintain or restore discipline." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)(internal quotation marks omitted); *see Hudson*, 503 U.S. at 6-7.  In determining whether prison officials acted maliciously and sadistically, a court should balance: 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the responsible officials, and; 4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321.

The question of use of excessive force turns on the totality of the circumstances.  *See Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).  In other words, the use of force must be considered "'in full context.'"  *Smith v. Ray*, 781 F. 3d 95, 101 (4th Cir. 2015) (citation omitted).

Notably, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action'" under the Eighth Amendment.  *Wilkins*, 559 U.S. at 37 (citation omitted).  Conversely, the absence of "significant" injury is not dispositive of a claim of excessive force. *Id*. at 36-37.  If force is applied maliciously and sadistically, liability is not avoided "merely because [the plaintiff] had the good fortune to escape without serious injury."  *Id*. at 37.  In other words, there

is no "de minimis" level of injury that is an acceptable result of excessive force under the Eighth Amendment.  *Wilkins*, 559 U.S. at 38-40.  But, the extent of an inmate's injury is one factor indicative of whether the force used was necessary in a particular situation.  In *Wilkins*, the Supreme Court stated: "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Id.* at 37 (quoting *Hudson*, 503 U.S. at 7).  Thus, a court must look at "the nature of the force rather than the extent of the injury." *Wilkins*, 559 U.S. at 34.

To be sure, prison officials are charged with balancing competing governmental interests. These include the maintenance of order; protection of correctional officers, prison staff and other inmates; and inmates' rights to be free from cruel and unusual punishment.  *See Whitley*, 475 U.S. at 321.  When force is needed to keep order, correctional officers may have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates.  *See Hudson*, 503 U.S. at 6; *see also Smith v. Ray*, 781 F.3d at 101 (analyzing an excessive force claim under the Fourth Amendment and stating: "In considering the reasonableness of an officer's actions, we must consider the facts at the moment that the challenged force was employed."); *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  Thus, in excessive force cases, the subjective component is measured by the same standard as the objective: "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

Wagner's use-of-force allegations are directed primarily at Gilpin and Rounds.  But, he also asserts, *inter alia*, that Mallow put a tether on him, pulled him, and held him "by the cuffs, neck and tether cutting [his] wrist, arm and hands."  ECF 1 at 3; *see also* ECF 1-1 at 3-4, ¶¶ 18, 30, 31.  And, he expressly states that Mallow and Iames "did not participate in the heart of the

assault . . . ."  ECF 1-1 at 5, ¶ 48.  Given the complete lack of allegations as to the use of force by

Iames, he is entitled to summary judgment in his favor with respect to the excessive force claim.

Additional information is needed to resolve the excessive force issues presented in this

case as to Rounds, Gilpin, and Mallow.  For example, Wagner claims the use of force incident

was recorded on a hand held camera, but defendants do not address whether an additional

recording using a handheld camera was made.  As noted, the video recording filed in this case

only captures the prison tier from stationary surveillance cameras, and provides little useful

information because the events at issue were not in view of the cameras.

Most important, each side presents fundamentally different versions of the incident, and

the court may not resolve factual disputes in the context of a summary judgment motion.  As

stated earlier, the district court's "function" is not "to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at

249. Moreover, the trial court may not make credibility determinations on summary judgment.

*Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015);

*Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp.*

*v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.  In the face of

conflicting material evidence, such as competing affidavits, summary judgment is generally not

appropriate, because it is the function of the factfinder to resolve factual disputes, including

matters of witness credibility.

Viewing the facts in the light most favorable to Wagner, he has advanced sufficient

evidence as to Gilpin, Rounds, and Mallow to demonstrate genuine disputes of material fact

concerning the use of excessive force.  In cases where, as here, the parties advance differing

versions of events in declarations or affidavits, and those differences involve genuine disputes of

material fact regarding whether force was applied maliciously, summary judgment is precluded. The issue requires credibility determinations not appropriate for resolution on summary judgment. *See Anderson,* 477 U.S. at 255.

Accordingly, as to the use-of-force claim, the State's Motion for summary judgment will be denied as to Rounds, Gilpin, and Mallow.

### b.  Failure to Protect

The failure to protect claim is directed against Mallow and Iames.  Wagner complains that neither Mallow nor Iames sought to stop the attack.  ECF 1 at 3; ECF 1-1 at 5, ¶48.  To the contrary, he contends that Iames actually "encouraged the matter."  ECF 1 at 3; *see also* ECF 1-1 at 5, ¶ 48.  Iames denies witnessing officers assault Wagner on September 24, 2014, and failing to intervene.  ECF 33-16, ¶ 5.  Mallow's Declaration does not directly address the failure to protect claim.  ECF 33-15.

The right to be free from cruel and unusual punishment includes the right to be protected from a substantial risk of serious harm at the hands of other inmates.  *See Farmer v. Brennan,* 511 U.S. 825 (1994); *Winfield v. Bass*, 106 F.3d 525, 531 (4th Cir. 1997); *Belcher v. Oliver,* 898 F.2d 32, 34 (4th Cir. 1990).  "The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials."  *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832).  Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'"  *Raynor*, 817 F.3d at 127 (citation omitted).

To be sure, "not every injury suffered by a prisoner at the hands of another 'translates into constitutional liability for prison officials responsible for the victim's safety.'"  *Makdessi*, *supra*, 789 F.3d at 133 (citation omitted).  But, "corrections officers have 'a duty to protect

prisoners from violence at the hands of other prisoners,' for '[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Raynor*, 817 F.3d at 127 (citation omitted) (alteration in *Raynor*).

A two-part test that consists of both an objective and a subjective component must be satisfied in order for a plaintiff to establish liability for failure to protect.  *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury," or a substantial risk of such injury. *Danser*, 772 F.3d at 346–47 (internal quotations omitted).  The objective inquiry "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in *Helling*).

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834.  To establish a culpable state of mind, there must be "evidence suggesting that the prison official had actual knowledge of an excessive risk to the [prisoner's] safety." *Danser*, 772 F.3d at 347.  This may include evidence that prison officials were "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,'" and that the inference was drawn. *Raynor*, 817 at 128 (citing *Farmer*, 511 U.S. at 837).  A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways, including inference from circumstantial evidence,'" and "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128 (citing *Farmer*, 511 U.S. at 837).

Actual knowledge of a substantial risk does not necessarily result in liability, however.  If a prison official responded reasonably to a risk, he or she "may be found free from liability. . . ." *Farmer*, 511 U.S. at 844.

Of import here, in a failure-to-protect case, "'prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm.'"  *Raynor*, 817 F.3d at 128 (quoting *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995)).  On the other hand, the failure to take any action "to stop an ongoing assault on a prisoner can amount to deliberate indifference."  *Raynor*, 817 F.3d at 128 (citing *Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) (en banc); *see also Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003).  If the officer "had a reasonable opportunity to act and 'simply refused to do so,'" the officer's failure to intervene during an assault may give rise to liability under § 1983.  *Raynor*, 817 F.3d at 128 (citation omitted).

The parties offer dueling affidavits with substantially different accounts.  "[I]n such posture, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion."  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation and internal quotation marks omitted).

Accordingly, for the same reasons that require denial of summary judgment as to the excessive force claim, I shall deny summary judgment as to the failure to protect claim with respect to Mallow and Iames.  However, in light of the allegations, I shall grant summary judgment as to this claim in favor of Gilpin and Rounds.

### c.   Denial of Medical Care[28]

---

[28] I previously set forth the standard that applies to a claim of inadequate medical care.  I need not restate it here.

A prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, *supra*, 896 F.2d at 853. As noted earlier, even officials who acted with deliberate indifference may be "free from liability if they responded reasonably to the risk." *Farmer*, 511 U.S. at 844.

Wagner claims he was left bleeding and in pain after the alleged assault, although he does not fault specific officers.  ECF 1-1 at 4, ¶ 43.  It was not until other inmates caused a disturbance that Wagner says he was taken to the medical room.  *Id.*  Officer Iames attests he has never denied or interfered with Wagner's medical treatment or deprived him of his asthma medication.  ECF 33-16 ¶¶ 7, 10.

Rounds, Gilpin, and Mallow do not address this allegation in their declarations.  ECF 33-14, 15.  Nevertheless, the medical records indisputably establish that Wagner was taken to the medical office less than an hour after the incident.  Nor is there any basis to conclude that the 45 minutes it took for Wagner to be seen by Clark constituted an unacceptable or unreasonable delay, especially given that there is no indication that Wagner's injuries were serious or life threatening.

I will grant summary judgment as to this claim as to all remaining State Defendants because there are no genuine issues of material fact that render summary judgment inappropriate.

### d.  Retaliation

Wagner claims he was attacked in retaliation for speaking with a detective from the IIU. ECF 1 at 3; ECF 1-1 at 2, ¶14.  The State Defendants argue summarily that Wagner has provided no proof to support these allegations.  ECF 33-2 at 29, 25.  In their declarations, Rounds, Gilpin, Mallow, and Ames deny threatening or retaliating against Wagner.  ECF 33-13, ¶¶ 5, 9; ECF 33-14, ¶¶ 4, 10; ECF 33-15, ¶¶ 4, 6; ECF 33-16, ¶¶ 2, 4.

A prisoner's claim that prison officials have retaliated against him for engaging in protected conduct is grounded in the First Amendment. *Mount Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977); *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir.1999) (en banc). A retaliation claim has three elements: 1) the prisoner engaged in protected conduct; 2) an adverse action was taken against the prisoner that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) a causal connection exists between the first two elements, i.e., the prisoner's protected conduct motivated at least in part the adverse action. *See Thaddeus-X.*, 175 F.3d at 394.

In the prison context, a plaintiff must establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals. *See Rizzo v. Dawson*, 778 F.2d 527, 532 & n. 4 (9th Cir.1985). The preservation of internal order and discipline is a legitimate goal. *Id.* at 532. If a plaintiff establishes a prima facie case, the burden shifts to defendants to demonstrate that they would have reached the same decision in the absence of Wagner's constitutionally protected conduct. *See Doyle*, 429 U.S. at 287. "In the prison context, we treat [retaliation] claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir.1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

Verbal abuse of inmates by guards, without more, states no claim of assault. *See Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979); *see also Carter v. Morris*, 164 F.3d 215, 219 n. 3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim). However, a threat of harm, combined with action apparently designed to carry out a threat, may state an Eighth Amendment claim. *Hudspeth v. Figgins*, 584 F.2d 1345 (4th Cir. 1978). It also may state a

claim of denial of access to courts if threats were intended to intimidate an inmate from exercising that right. *Id.*; *see also Russell v. Oliver*, 552 F.2d 115 (4th Cir. 1977).

Although the nature of Wagner's interview with the IIU investigator is not in the record, it is likely the matter involved a question regarding Wagner's allegations of earlier assaults referenced in his Complaint, and these matters may involve access to court issues. The temporal proximity of defendants' conduct to Wagner's meeting with the IIU officer, viewed in the light most favorable to Wagner, suggests there are genuine issues of material facts in dispute. The parties' declarations offer differing accounts and raise issues of credibility, inappropriate for resolution on summary judgment.

For this reason, I shall deny summary judgment with respect to the retaliation claim as to Gilpin, Rounds, Mallow, and Iames.

### e.  Due Process[29]

The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of. . . liberty . . . without due process of law." To succeed on a due process claim, a plaintiff must first show the existence of a protected property or liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Imprisonment is a deprivation of a liberty interest, but it is constitutional, provided that the conviction is valid and "the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). In *Sandin v. Conner*, 515 U.S. 472, 486 (1995), the Supreme Court held that "discipline in segregated confinement [does] not present the type of atypical, significant deprivation in which a State might conceivably create a liberty

---

[29]     In answer to a question concerning exhaustion of administrative remedies, Wagner alleges in the Complaint that the first ARP he filed concerning the alleged assault was "stolen by accused." ECF 1 at 2. Wagner does not further elaborate. He provides no additional details in support. In any event, the State Defendants do not assert failure to exhaust.

interest." Prisoners retain certain rights under the Due Process Clause.  But, prison disciplinary proceedings are not part of a criminal prosecution and the full array of rights due a defendant in such proceedings does not apply.  *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing *Morrissey*, 408 U.S. at 488).  Federal due process requirements are not implicated by most disciplinary proceedings that do not involve the loss of good time credits.  *See Sandin v. Conner*, 515 U.S. 472, 484 (1995).

The basic due process standards applicable to a prison disciplinary proceeding are set forth in *Wolff v. McDonnell*, 418 U.S. at 556. As the Supreme Court explained in *Wolff*, although prisoners "may not be deprived of life, liberty, or property without due process of law," their due process rights remain "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Id*. Accordingly, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.*

Applying those principles, the Supreme Court held in *Wolff* that a prisoner facing a disciplinary hearing is entitled to: (1) written notice of the charges, at least 24 hours before the disciplinary hearing; (2) an opportunity "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals"; and (3) a "written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action" imposed. *Id.* at 564-66 (quotation marks and citation omitted). Nevertheless, inmates are not entitled to a right of confrontation, nor are they guaranteed a right to counsel. *Id.* at 567-70; *see Baxter v. Palmigiano*, 425 U.S. 308, 322-23 (1976); *Brown v. Braxton*, 373 F.3d 501, 505-06 (4th Cir. 2004). Further, substantive due

process is satisfied where a disciplinary hearing decision is based upon "some evidence." *Superintendent, Mass. Correctional Institute v. Hill*, 472 U.S. 445, 455 (1985).

Regarding an inmate's opportunity to call witnesses where no undue hazard to "institutional safety or correctional goals" exists, the Court emphasized in *Wolff*: "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority . . ." 418 U.S. at 566. To that end, a prison official may refuse to call a witness for reasons including "irrelevance, lack of necessity, or the hazards presented in individual cases." *Id.*; *see Brown v. Braxton*, 373 F.3d at 505 ("[A]fter *Wolff*, it was clearly established that prison officials had the discretion to deny witness requests, where legitimate penological interests justified excluding a witness."); *see also Ferreira v. Dubois*, 963 F. Supp. 1244, 1253 n.16 (D. Mass. 1996) ("Prison officials therefore have the discretion to deny live witness testimony where such testimony is irrelevant or unnecessary.").

In *Ponte v. Real*, 471 U.S. 491, 497 (1985), the Supreme Court built upon its holding in *Wolff*, stating:

> [P]rison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but . . . they may do so either by making the explanation a part of the "administrative record" in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a "liberty" interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the hearing, or they maychoose to explain it "later." . . . [S]o long as the reasons are logically related to "institutional safety or correctional goals," the explanation should meet the due process requirements as outlined in *Wolff*.

The *Ponte* Court acknowledged that, given the "significant limitations on an inmate's right to call witnesses," coupled with the deference to prison officials' judgment recognized in *Wolff*, "it may be that a constitutional challenge to a disciplinary hearing . . . will rarely, if ever,

be successful." *Id.* at 499. As the Fourth Circuit explained in *Brown v. Braxton*, 373 F.3d at 505, "*Wolff* establishes beyond doubt" that disciplinary hearing officers "may decide that legitimate penological interests justify the denial of an individual inmate's witness request, and their decisions are not to be lightly second-guessed by courts far removed from the demands of prison administration." Indeed, "[d]eference to prison administrators may mean upholding a denial of a request even in situations [in which] the 'denied witness *might* have provided testimony to exculpate [the inmate],' or where the reviewing court might have ruled differently had it been conducting the hearing." *Shuck v. Bledsoe*, 2005 WL 1862666, at *2 (W.D. Va. Aug. 3, 2005) (quoting *Afrika v. Selsky*, 750 F. Supp. 595, 601 (S.D.N.Y. 1990) (emphasis in *Afrika*)).

Nevertheless, the *Ponte* Court expressly rejected an approach that would "place the burden of proof on the inmate to show why the action of the prison officials in refusing to call witnesses was arbitrary or capricious." 471 U.S. at 499. Accordingly, *Ponte* has been read to hold that "'the burden of persuasion as to the existence and sufficiency of such institutional concerns [justifying the denial of an inmate's request to call witnesses] is borne by the prison officials, not by the prisoners.'" *Smith v. Massachusetts Dept. of Correction*, 936 F.2d 1390, 1399-1400 (1st Cir. 1991) (quoting *Grandison v. Cuyler*, 774 F.2d 598, 604 (3d Cir. 1985); modification in *Smith*). *Accord Bostic v. Carlson*, 884 F.2d 1267, 1273 (9th Cir. 1989) ("The burden of proving adequate justification for denial of a request to present witnesses rests with the prison officials.").

Wagner attests that Officer Earl Ritchie went to his cell with the Notice of Rule Violation but refused to give it to him. Instead, Ritchie wrote on the notice that Wagner had refused to sign it. ECF 1-1 at 6-7, ¶¶ 66, 69. Wagner claims he was denied due process because he did not receive a notice of the infraction charge, was not given a chance to represent himself, was not

allowed to call witnesses, and was not allowed to attend the hearing.  Further, Wagner disputes defendants' explanation that he did not attend the hearing on October 2, 2014, because he was on staff alert and therefore deemed a threat to institutional security.  *Id*. at 6, ¶ 68; *id.* at 7, ¶¶ 70, 71. Wagner counters that he was removed from the contingency cell and staff alert on September 29, 2014, which was prior to the adjustment hearing.  *Id*. at 7, ¶¶ 70. 71.

Officers Dolly and Ritchie both signed the infraction notice under oath.  ECF 33-6 at 3, 6.  It is also undisputed that the hearing officer did not sanction Wagner with a revocation of diminution of credits.  ECF 33-6 at 10.  Ordinarily, absent a loss of earned diminution credits or other deprivation of a constitutionally protected liberty interest, due process is not triggered.  *See Meachum*, 427 U.S. at 225-29; *Sandin*, 515 U.S. at 484.  Absent a protected liberty interest, a plaintiff cannot successfully claim that his due process rights were violated because "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

Although a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), "there are exceptions to this rule." *Cole v. Holloway*, 631 Fed. Appx. 185, 186 (4th Cir. 2016) (citing *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989) (holding that a disciplinary charge may be actionable under § 1983 if retaliatory)).  In *Cole*, the Fourth Circuit affirmed as modified the dismissal of Virginia inmate Nathan Cole's claim that he was improperly charged with a disciplinary conviction.   Because Cole did not allege a motivation behind the defendants' alleged actions, the appellate court modified the district court's dismissal of the claim to show it was without prejudice.   *Id*. Notably, the Court explained that "unprincipled manipulation of legitimate prison regulations, to the detriment of a prisoner, can constitute an arbitrary punishment."  *Id.* at 186.  "[I]f Cole could

prove a set of facts showing unconstitutional retaliation or arbitrary punishment, the allegedly false disciplinary charges might support a claim for relief." *Id.*

Wagner has submitted a Declaration stating that he was not provided with proper notice or permitted the opportunity to attend his adjustment hearing, for no legitimate reason. But, he has not set forth any facts that suggest that it was the named defendants who allegedly violated his due process rights. Therefore, as to the named defendants, he has failed to state a claim. Accordingly, I shall dismiss the due process claim, without prejudice to Wagner's right to file an amended complaint to cure the deficiencies.

### f.  Qualified Immunity

The State Defendants argue that they are entitled to summary judgment because they are protected by qualified immunity.

"Qualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Osborne v. Georgiades*, ____ Fed. App'x ____, 2017 WL 521570, at *3 (4th Cir. Feb. 8, 2017); *Scinto v. Stansberry*, *supra*, 841 F.3d at 235. *In Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 395 (4th Cir. 2014), *cert. denied sub nom. Baltimore City Police Dep't v. Owens*, ____ U.S. ____, 135 S. Ct. 1983 (2015), the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Saucier v. Katz*, 533 U.S. 194, 206 (2001), overruled in part by *Pearson v. Callahan*, 555 U.S. 223 (2009); *Crouse v. Town of Moncks Corner*, ____ F.3d ____, 2017 WL

624166, at *3 (4th Cir. Feb. 15, 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir.), *cert. denied*, ____ U.S. ____ , 133 S. Ct. 789 (2012).   Thus, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.

Notably, qualified immunity is an "'immunity from suit rather than a mere defense to liability' . . . ." *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*).   Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'"   *Ussery*, 786 F.3d at 337 (quoting Mitchell, 472 U.S. at 526).

As the Supreme Court has explained, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. at 231.   "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"   *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting Malley v. *Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, ____ U.S ____, 134 S. Ct. 3, at *5 (2013) (per cuiram). Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' " *Pearson*, 555 U.S. at 231.

 Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow*, 457 U.S. at 818, and so an officer who makes an honest but objectively unreasonable mistake is not protected by qualified

immunity. The doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.' " *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Purnell,* 652 F.3d at 531); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). In other words, qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.' " *Lane v. Franks*, _ U.S. _, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.' " *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (en banc), *cert. denied*, ____ U.S. ____, 132 S. Ct. 781 (2011) (citation omitted); *see also, e.g., Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004).

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto,* 841 F.3d at 235 (citations omitted.). Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," *Saucier,* 533 U.S. at 201; and (2) whether the right at issue " 'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.' " *Merchant, supra*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see*

*Owens, supra*, 767 F.3d at 395-96. The "two inquiries . . . may be assessed in either sequence."
*Merchant*, 677 F.3d at 661-62; *accord Pearson*, 555 U.S. at 236 (stating that judges are
"permitted to exercise their sound discretion in deciding which of the two prongs of the qualified
immunity analysis should be addressed first in light of the circumstances in the particular case at
hand").

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed
in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt
v. Millender*, ── U.S. ──, 132 S. Ct. 1235, 1245 (2012) (citing *Anderson v. Creighton*, 483
U.S. 635, 639 (1987)).  If the law at the time of the alleged violation was not "clearly
established," the official will be entitled to qualified immunity, because "an official could not
reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said
to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S.
at 818.  On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily
should fail, since a reasonably competent public official should know the law governing his
conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the
right at issue.  *Scinto*, 841 F.3d at 235; *Occupy Columbia*, 738 F.3d at 118.  "A right is clearly
established only if its contours are sufficiently clear that 'a reasonable official would understand
that what he is doing violates that right.' " *Carroll v. Carman*, __U.S. __, 135 S. Ct. 348, 350
(2014) (quoting *Creighton*, 483 U.S. at 640).  "In other words, 'existing precedent must have
placed the statutory or constitutional question beyond debate.'" *Carroll*, 135 S. Ct. at 350
(quoting *al-Kidd*, 563 U.S. at 741); *see City & Cnty. of San Francisco, Calif. v. Sheehan*,
____U.S. ____, 135 S. Ct. 1765, 1774 (2015); *Plumhoff v. Rickard*, ____ U.S. ____, 134 S. Ct.

2012, 2023 (2014); *see also Reichle v. Howards*, ____ U.S. ____, 132 S. Ct. 2088, 2093 (2012) ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right' ") (citation and some quotation marks omitted).

In determining whether a right was clearly established, courts in this Circuit "'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose,' " as of the date of the conduct at issue. *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir.) (citations omitted), *cert. denied*, 562 U.S. 890 (2010). Notably, "a right may be clearly established by any number of sources, including a criminal case, a statute, or the Constitution itself." *Owens,* 767 F.3d at 399. However, there need not be a case "directly on point. . . ." *al-Kidd*, 563 U.S. at 741; *see also Crouse*, ____ F.3d ____, 2017 WL 624166, at *3.

The question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.' " *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

In my view, the cases cited earlier clearly establish that constitutional rights may be violated if a shackled inmate is assaulted by prison officials without provocation, with improper retaliatory animus, and while other officers simply ignore the attack. To be sure, plaintiff may

not prove his allegations.  But, on the face of the allegations, qualified immunity does not apply to such claims.

### VI.    Motion for Appointment of Counsel

Wagner requests appointment of counsel because he is on disciplinary segregation and has limited access to the law library.  He adds that he has limited knowledge of the law.  Wagner contends this case involves complex issues which required investigation and discovery.  ECF 1-1 at 14-18; *see also* ECF 1-1 at 19-20 (Wagner Decl.).  For the reasons stated in this Memorandum Opinion, I will grant the motion.

### V.    Conclusion

For the reasons stated in this Memorandum Opinion, I will grant Clark's Motion for Summary Judgment (ECF 26) and enter judgment in her favor.  As to defendant Wilt, I will construe the State's Motion (ECF 33) as a motion to dismiss and will grant it.  Therefore, I shall dismiss the Complaint as to all claims against Wilt.  As to the Due Process claims against Bishop, Iames, Mallow, Gilpin, and Rounds, I shall construe the State's Motion (ECF 33) as a motion to dismiss and shall grant it, without prejudice, and with leave to amend.  As to all of the remaining claims, I shall construe the Motion (ECF 33) as one for summary judgment.  With respect to the excessive force claim, I shall DENY the State's Motion as to Gilpin, Rounds, and Mallow, and I shall GRANT the Motion as to Bishop and Iames.  With respect to the failure to protect claim, the State's Motion as to Iames and Mallow will be DENIED, but I shall GRANT the Motion as to Bishop, Gilpin, and Rounds.  As to the retaliation claim, I will GRANT the Motion as to Bishop and DENY it as to Iames, Gilpin, Rounds, and Mallow.  And, as to the claim of failure to provide adequate medical care, I will GRANT the State's Motion as to Bishop, Iames, Mallow, Gilpin, and Rounds.

In addition, I will deny Wagner's motion for a temporary restraining order and preliminary injunction as well as his his first motion to preserve evidence.  ECF 8; ECF 16. And, I will grant Wagner's Motion for Appointment of Counsel. ECF 39.  I shall deny, without prejudice, Wagner's second motion to preserve evidence (ECF 36), which I have construed as a motion for discovery, subject to refiling as deemed appropriate by appointed counsel.  Wagner's motion for an extension of time (ECF 35) will be granted nunc pro tunc.

A separate Order follows.


February 27, 2017                              _____/s/_____
Date                                           Ellen L. Hollander
                                               United States District Judge

68